IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE LUIS FONSECA RAMIREZ,<br><br>Defendant. | 8:12CR186<br><br>FINDINGS AND RECOMMENDATION |

This matter is before the court on the motion to suppress filed by defendant Jose Luis Fonseca Ramirez (Fonseca) (Filing No. 73). Fonseca is charged in the Superseding Indictment with reentry of a removed alien after a conviction for an aggravated felony without first having obtained consent to reapply for admission into the United States (Count I), in violation of 8 U.S.C. §§ 1326(a) and (b)(2), and knowingly conducting and attempting to conduct a financial transaction affecting interstate commerce, to wit, the receipt, transportation, and delivery of $30,000 in United States currency (Count II), in violation of 18 U.S.C. § 1956(a)(1)(B)(i). See Filing No. 89 - Superseding Indictment. Fonseca seeks to suppress evidence obtained, including statements made, after Fonseca was illegally detained, subjected to an illegal search, and arrested by officers of the Omaha Police Department (OPD).

The court held an evidentiary hearing on Fonseca's motion on June 24, 2013. Fonseca was present for the hearing along with his counsel, James K. McGough. The United States was represented by Special Assistant U.S. Attorney David M. Wear. Laura Garcia-Hein, a certified Spanish language interpreter, served as the interpreter for the hearing. During the hearing, the court heard the testimony of OPD Officer Aaron Hanson (Officer Hanson). The court received into evidence a DVD of Officer Hanson's stop of Fonseca. A transcript of the hearing (TR.) was prepared and filed on July 1, 2013. See Filing No. 99.

### FINDINGS OF FACT

On June 3, 2012, at approximately 12:04 p.m., Officer Hanson, an officer with the OPD since 1996, specifically serving in the K-9 unit since 2000 and trained extensively

in criminal interdiction, observed a white, four-door Lincoln Town Car following too close to another vehicle (TR. 11-18).  Officer Hanson pulled behind the vehicle, activated his red and blue traffic lights, and effectuated a traffic stop (TR. 17).  Officer Hanson's police cruiser video camera recorded the entirety of the stop (TR. 17-18).  Officer Hanson noted the vehicle had California license plates, which was relevant to Officer Hanson's emphasis on interstate criminal interdiction because, according to Officer Hanson's training and experience, California is well known as a source state for controlled substances and an end point for illicit drug proceeds and guns (TR. 18-19).  After the driver of the vehicle pulled the vehicle to the right shoulder of the road, Officer Hanson made contact with the driver who identified himself as Fonseca (TR. 17-19, 56-57).

      Officer Hanson advised Fonseca the reason for the stop and asked for Fonseca's driver's license, registration, and proof of insurance (TR. 19-20, 55).  Officer Hanson informed Fonseca that if all of his paperwork checked out, Fonseca would receive a warning (TR. 35-36, 58).  As Officer Hanson approached the vehicle, Officer Hanson observed the vehicle had a single key in the ignition, meaning there was no key ring attached with other keys (TR. 20, 63-64).  Officer Hanson considered this relevant because typically an individual driving their own vehicle will have other keys attached on a key ring (TR. 20).  A single key indicated to Officer Hanson that Fonseca did not have an emotional attachment to his vehicle (TR. 21, 63-65).  Officer Hanson also noticed clothes hanging from the rear door hanger in Fonseca's vehicle (TR. 21, 65).  This was notable to Officer Hanson because, according to Officer Hanson's training and experience, there appears to be a trend of smugglers hanging their clothes from the rear door hanger to serve as a disclaimer to officers that the driver is traveling (TR. 21-22).  Officer Hanson further observed two cell phones in the vehicle (TR. 22, 65).  Officer Hanson took note of this fact because, in his training and experience, drug organizations will give a cell phone to a smuggler to track a smuggler or to get in immediate contact with the smuggler (TR. 22).  Officer Hanson asked Fonseca about the two cell phones and Fonseca stated the second phone was his girlfriend's phone (TR. 22).  Officer Hanson noticed Fonseca became nervous, started to stammer, and breathe heavily when discussing the cell phones (TR. 22, 66).  Officer Hanson

additionally noted a rosary hanging from the rearview mirror and a religious card on the vehicle dashboard (TR. 23, 69). These items were significant to Officer Hanson because, in his training and experience, people will use religious items as a disclaimer to law enforcement that the driver is a religious person and would never be involved in criminal activity (TR. 23). Officer Hanson stated smugglers are usually very religious or superstitious and will use religious items as good luck charms (TR. 23). Lastly, Officer Hanson noted the interior of the vehicle appeared rather free of items he typically observes when a person is traveling cross country (TR. 24, 69-70).

After Officer Hanson obtained Fonseca's paperwork and spoke about the cell phones, Officer Hanson asked Fonseca to meet Officer Hanson behind the vehicle (TR. 24, 81). Officer Hanson asked Fonseca to exit the vehicle because it was not optimal for Officer Hanson to stand at a window during a traffic stop in the event weapons were in the vehicle or car accidents occurred in the area (TR. 24, 56-57). Additionally, it was noisy and the optimal setting to speak with the driver was outside the vehicle or in Officer Hanson's cruiser (TR. 24-25). Officer Hanson testified Fonseca did not need to accompany Officer Hanson to the cruiser to run a check on Fonseca's paperwork, but it helps expedite the traffic stop (TR. 59).

Once Fonseca exited the vehicle, Officer Hanson asked permission to pat Fonseca down and asked Fonseca if he had any knives (TR. 25). Fonseca said he did not have any knives and that Officer Hanson could conduct a pat-down (TR. 25). Simultaneously with this discussion, Fonseca turned and lifted his shirt which Officer Hanson interpreted that Fonseca understood Officer Hanson wanted to conduct a pat-down (TR. 25). During the pat-down, Officer Hanson felt a bulge in Fonseca's front left pocket (TR. 25). Fonseca indicated it was approximately $2000 in cash (TR. 25-26). Officer Hanson took note of this amount of cash on Fonseca because, in conjunction with the other indicators, he thought it was suspicious to be traveling with a large amount of cash in your pocket and is indicative of narcotics smuggling (TR. 26). After discovering the cash on Fonseca's person, Officer Hanson asked Fonseca to sit in the front passenger seat of the cruiser (TR. 26). Officer Hanson asked Fonseca to sit in the cruiser because it was noisy outside, rather sunny, and the air-conditioned cruiser was a better environment to sit and conduct business during a traffic stop (TR. 26). Officer

Hanson does not have an individual sit in the front of his cruiser during every traffic stop, but it is routine for him to talk to people right outside his cruiser or in the cruiser depending on the environment and amount of traffic (TR. 27). About five minutes elapsed between the time Officer Hanson approached Fonseca in the vehicle and Officer Hanson asked Fonseca to sit in the cruiser (TR. 27).

Fonseca sat in the front passenger seat of the cruiser, unhandcuffed (TR. 27-28, 81). Although Officer Hanson asked Fonseca to shut the passenger door to the cruiser, Fonseca did not shut the door (TR. 28). Officer Hanson noted this because, based on Officer Hanson's kinesics body language training, smugglers are hesitant to close the cruiser door (TR. 28, 81-82). In conjunction with other indicators and Fonseca's nervous behavior, Officer Hanson considered this notable (TR. 28). Fonseca closed the door after Officer Hanson asked a second time (TR. 28).

In the cruiser, Officer Hanson reviewed Fonseca's paperwork and discussed Fonseca's travel itinerary (TR. 28). Fonseca indicated he had an uncle in the area and was visiting two of his nieces, one of which Fonseca did not know, from Wisconsin at a casino in Council Bluffs for a day, where Fonseca stayed (TR. 29). Fonseca stated he planned to move back to Omaha and live with his uncle (TR. 29). Fonseca's travel itinerary "struck [Officer Hanson] as an odd trip" because it was odd for Fonseca to visit with his nieces, one of which Fonseca did not know, for just one day (TR. 30-31). Officer Hanson thought the itinerary was rehearsed due to the way Fonseca recited the details (TR. 31). Upon reviewing Fonseca's paperwork, Officer Hanson discovered the vehicle was insured to Fonseca (TR. 30).

Fonseca also informed Officer Hanson that Fonseca had a criminal history with drugs and guns (TR. 31). While Officer Hanson conducted a local and national data check, which took approximately fifteen minutes, to confirm Fonseca's driving status and background, Officer Hanson and Fonseca again discussed Fonseca's plan to move to Omaha (TR. 32, 35). During this time Officer Hanson noted Fonseca was very talkative, which was suspicious in conjunction with other indicators of criminal activity, Fonseca stopped making eye contact, he was breathing heavily, laughing at inappropriate times, and seemed to be at a high level of nervousness (TR. 33-34). Upon the data check completion, Officer Hanson noted Fonseca had a criminal record

for controlled substance distribution in 1999 and 2000 and Fonseca's driver's license was expired (TR. 35-36). Officer Hanson reiterated Fonseca would receive a warning if all of Fonseca's paperwork checked out (TR. 35-36). At this point Officer Hanson also ran a check of the vehicle's license plate and determined the vehicle was registered to another individual and verified the vehicle was not stolen (TR. 36, 39, 74-75).

Officer Hanson asked Fonseca questions about the purchase of the vehicle (TR. 37). Fonseca explained the vehicle was part of the payment for a debt owed to him by a friend (TR. 37). Fonseca stated he owned the vehicle for about one week (TR. 37). This fact was notable to Officer Hanson because, in conjunction with other indicators of criminal behavior, it is indicative of someone being provided or acquiring a vehicle for the express purpose of smuggling (TR. 37-38). Officer Hanson noted Fonseca's story was also inconsistent with his insurance card, which indicated the vehicle was insured to him for approximately one month prior to the traffic stop (TR. 38-39, 83-85).

Subsequently, Officer Hanson completed the written warning for Fonseca for the moving violation and having an expired driver's license (TR. 39). This took about four to five minutes (TR. 39). After Fonseca signed the warning, Officer Hanson asked Fonseca if he had any questions (TR. 40, 77). Fonseca indicated he did not (TR. 40). Officer Hanson asked if he could ask Fonseca some more questions to which Fonseca did not object (TR. 40). At this time, approximately twenty-one minutes had passed (TR. 40).

Officer Hanson reiterated the challenges officers have with drug smuggling on the interstate and noticed this elicited added nervousness from Fonseca (TR. 41, 66-68). Officer Hanson also noticed a pulsating in Fonseca's neck (TR. 41, 66-68). Officer Hanson asked Fonseca if he had any guns, drugs, or large amounts of cash in the vehicle (TR. 41). Fonseca responded that he did not (TR. 41). Officer Hanson then asked for Fonseca's consent to search the vehicle (TR. 41). Fonseca said "go ahead" (TR. 41). Officer Hanson asked for Fonseca's consent about twenty-four minutes into the traffic stop (TR. 41). Throughout Officer Hanson's interaction with Fonseca, Officer Hanson maintained a conversational tone and did not yell, threaten, brandish a weapon, or make any promises to Fonseca (TR. 42-43). Fonseca was not handcuffed and did not appear intoxicated (TR. 43-44). Fonseca appeared to understand the questions

Officer Hanson asked and Officer Hanson did not have any trouble speaking with Fonseca in English (TR. 43-44, 93). Additionally, although another officer arrived for backup while Officer Hanson spoke with Fonseca, no other officers were walking around the cruiser (TR. 43).

After Officer Hanson received Fonseca's consent, Officer Hanson left Fonseca in the cruiser and searched Fonseca's vehicle with another officer, Officer Randy Pignotti (Officer Pignotti) (TR. 44). Officer Pignotti located a $10,000 bundle of rubber-banded cash in a bag under the spare tire in the trunk (TR. 44-45). The officers located another similar package of $10,000 in a plastic bag in the driver's side sidewall in the trunk (TR. 45). Officer Hanson suspected the cash was illicit proceeds and the packaging was indicative smuggling (TR. 45, 87-89). The officers smelled and located a can of spray paint and searched for a hidden compartment, but were unable to locate one (TR. 45, 93-94). Officer Pignotti also discovered a Motel 6 receipt in the trunk that showed Fonseca stayed in Council Bluffs for two to three days (TR. 45-46).

Officer Hanson returned to his cruiser to speak with Fonseca at which point Fonseca said something to the effect of "they're going to kill me, 90 percent, I'm dead" (TR. 46). This statement concerned Officer Hanson and Officer Hanson told Fonseca he was "clearly in some trouble" and "if he was truly in danger that we were there to help him with that and protect him" (TR. 46). With all of this information, Officer Hanson determined to remove the vehicle from the road and conduct a more thorough search in a safe location to preserve evidence and officer safety (TR. 46-47). Additionally, Officer Hanson had concern for Fonseca's safety because of Fonseca's statement (TR. 47). Officer Hanson informed Fonseca of their plan to move the vehicle and Fonseca did not object (TR. 48). Fonseca did not limit the officers' search or object to any portion of the search and move to the impound lot (TR. 48-49). Officer Hanson transported Fonseca to the impound lot while another officer drove Fonseca's vehicle (TR. 49). Fonseca was not handcuffed (Ex. 1 - DVD at 36-43 minutes).

At the impound lot, Fonseca was taken inside to speak with a Homeland Security agent (TR. 50). While Fonseca spoke with the agent, Officer Hanson and other officers searched Fonseca's vehicle (TR. 50). According to Officer Hanson's understanding, Fonseca agreed to submit to an interview with Homeland Security agents, was advised

6

of his *Miranda* rights, made admissions regarding the money and his immigration status, and was taken into custody (TR. 51). To Officer Hanson's understanding, Fonseca was also *Mirandized* and interviewed the following day (TR. 51-52).

Officer Hanson testified Fonseca was not free to leave during the traffic stop (TR. 92). However, Officer Hanson never officially placed Fonseca under arrest (TR. 92). Officer Hanson also never read Fonseca his *Miranda* rights (TR. 93).

## LEGAL ANALYSIS

Fonseca does not contest the legality of the traffic stop, therefore the court will address Officer Hanson's contact with Fonseca after Officer Hanson effectuated the traffic stop for following too close to another vehicle.

A.   Pat-Down Search and Background Questions

Fonseca argues Officer Hanson impermissibly expanded the scope of the stop into an unlawful detention and interrogation. **See** [Filing No. 74](Filing No. 74) - Brief p. 2-4. Fonseca argues Officer Hanson placed Fonseca in the cruiser on a "hunch," solely based on Fonseca's apparent nervousness and on-person cash, that criminal activity may be afoot. *Id.* Fonseca contends this unlawful detention requires suppression of any evidence found in the subsequent searches and all statements Fonseca made. *Id.*

Contemporaneous with a valid traffic stop, "the officer [is] entitled to conduct an investigation reasonably related in scope to the circumstances that initially prompted the stop." *United States v. Lyons*, 486 F.3d 367, 371 (8th Cir. 2007) (**quoting** *United States v. McCoy*, 200 F.3d 582, 584 (8th Cir. 2000) (per curiam)). "[D]uring a traffic stop, an officer may detain the occupants of the vehicle while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation." *United States v. Bowman*, 660 F.3d 338, 343 (8th Cir. 2011) (internal quotation omitted). The routine tasks may include computerized checks of the vehicle registration, driver's license and criminal history; and issuing a citation. **See** *id.*; *United States v. Peralez*, 526 F.3d 1115, 1119 (8th Cir. 2008); **see also** *United States v. Sokolow*, 490 U.S. 1, 7 (1989). Additionally, the police officer may inquire about the driver and other occupant's destination, purpose of the trip, and whether the police

7

officer may search the vehicle. **See** *Peralez*, 526 F.3d at 1119; **United States v. Gill**, 513 F.3d 836, 845 (8th Cir. 2008). "Asking an off-topic question, such as whether a driver is carrying illegal drugs, during an otherwise lawful traffic stop does not violate the Fourth Amendment." **United States v. Long**, 532 F.3d 791, 795 (8th Cir. 2008). Similarly, "[a]sking for consent to search does not violate the Fourth Amendment in the absence of coercive or otherwise unusual circumstances." **United States v. Riley**, 684 F.3d 758, 764 (8th Cir. 2012) (alteration in original). Additionally, "a reasonable investigation during a traffic stop may include . . . requesting the driver to sit in the patrol car." *Id.* at 763-66 (internal quotation marks omitted).

"If the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry to satisfy those suspicions." **United States v. Ward**, 484 F.3d 1059, 1061 (8th Cir. 2007) (**quoting United States v. Johnson**, 58 F.3d 356, 357 (8th Cir. 1995)). Specifically, an officer may take further action as necessitated by the information volunteered by the motorist, observations of the contents of the vehicle, perceptions made by the police officer regarding illegal drug use, and divergent information from the passengers. **See United States v. $404,905.00**, 182 F.3d 643, 647 (8th Cir. 1999). In any event, the scope and length of any investigation must be reasonable. **United States v. Chavez Loya**, 528 F.3d 546, 553 (8th Cir. 2008). "The investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Ward*, 484 F.3d at 1062 (**quoting United States v. Bloomfield**, 40 F.3d 910, 916 (8th Cir.1994) (en banc)).

The court finds no constitutional infirmities with Officer Hanson's pat-down of Fonseca, request for Fonseca to sit in the patrol cruiser, or questions regarding Fonseca's itinerary. Fonseca consented to the pat-down search prior to entering the patrol cruiser. **See** TR. 25. Additionally, the Eighth Circuit has repeatedly held questions during a valid traffic stop regarding an individual's travel itinerary and criminal and driving background are permissible. **See, e.g.,** *Riley*, 684 F.3d at 764-66. Officer Hanson's questions did not impermissibly extend the traffic stop because Officer Hanson asked the questions during the time he waited for a report on Fonseca's criminal and driving history, a permissible task to be completed during the course of a

traffic stop. Accordingly, Officer Hanson's pat-down of Fonseca, request for Fonseca to sit in the patrol cruiser, and general background and travel itinerary questions did not constitute constitutional violations.

B.   **Consent for Vehicle Search**

Fonseca argues his consent was not free from coercion due to his detention. **See** [Filing No. 74](Filing No. 74) - Brief p. 5-6. Fonseca contends Officer Hanson did not have probable cause to arrest Fonseca. *Id.* at 6. Specifically, Fonseca argues the money discovered in his vehicle was insufficient to establish probable cause. *Id.* (**citing United States v. $141,770.00**, 157 F.3d 600, 603-04 (8th Cir. 1998) (indicating that "any amount of money, standing alone, would probably be insufficient to establish probable cause for forfeiture")). Fonseca argues any statements he made were derived from an illegal detention, search, and arrest and should be suppressed as fruit of the poisonous tree. *Id.* at 7-8.

The Constitution guarantees the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "While the Fourth Amendment does not permit warrantless searches, law enforcement may conduct such a search if they obtain [the owner's] voluntary consent." **United States v. Quintero**, 648 F.3d 660, 667 (8th Cir. 2011). "Whether consent is voluntary is a question of fact . . . considering whether from the totality of the circumstances the officer reasonably believed the search was consensual." **United States v. Garcia**, 613 F.3d 749, 753 (8th Cir. 2010). Some personal characteristics that aid in determining voluntariness of consent are age, intelligence, whether an individual was under the influence of drugs or alcohol, whether an individual was read his *Miranda* rights, and whether an individual had experienced prior arrests. **See United States v. Hambrick**, 630 F.3d 742, 747-48 (8th Cir. 2011) (listing factors). A court may also look at environmental factors including, the period of time the individual was detained; whether the police threatened, physically intimidated, or punished the individual; whether promises or misrepresentations were made upon which the individual relied; whether the individual was in custody or under arrest at the time of consent; whether the consent occurred in a public or secluded place; and

9

whether the individual objected or stood by silently while the search occurred. *Id.* These are a non-exhaustive list to assist the court's determination. *Quintero*, 648 F.3d at 667. "The government has the burden to prove the consent was voluntary by a preponderance of the evidence and based upon the totality of the circumstances." ***United States v. Beasley***, 688 F.3d 523, 531 (8th Cir. 2012). "When a motorist gives consent to search his vehicle, he necessarily consents to an extension of the traffic stop[.]" ***United States v. Rivera***, 570 F.3d 1009, 1013 (8th Cir. 2009).

Within a four minutes after Officer Hanson issued Fonseca the traffic warning, Officer Hanson asked Fonseca's consent to search the vehicle. **See** TR. 41. Fonseca said "go ahead." **See** *id.* At that time, Fonseca consented to an extension of his detention. Fonseca is an adult, there is no evidence he was intoxicated, he understood Officer Hanson's questions, Fonseca experienced prior arrests suggesting an awareness of protections the legal system affords to suspects, Fonseca gave consent on a public roadway during daylight hours, the area was not police dominated, and Officer Hanson did not employ threats, promises, misrepresentations, or brandish a weapon to obtain Fonseca's consent. **See** TR. 42-44, 93. Based on the totality of the circumstances, the court finds Fonseca voluntarily consented to the search of his vehicle.

During the search the officers discovered two packages each containing $10,000. After the officers located the cash, Fonseca said to Officer Hanson "they're going to kill me, 90 percent, I'm dead." **See** TR. 46. Fonseca's statement was not in response to a question and was voluntarily made therefore there is no basis to suppress the statement. **See** *Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence."); **see also** *United States v. Briones*, 390 F.3d 610, 612-13 (8th Cir. 2004) (holding defendant's "blurted out" statement admissible).

Based on several indicators that suggested smuggling activity, Officer Hanson determined to continue the search at the impound lot. Such indicators included an inconsistent and odd travel itinerary, a single ignition key devoid of a key ring and other keys, religious items in Fonseca's vehicle, lack of luggage in the back seat of the vehicle, California license plates, two cell phones, rubber-banded bundles of high

quantities of cash[1], Fonseca's voluntary statement "they're going to kill me, 90 percent, I'm dead" after the officers located the cash, and Fonseca's level of nervousness. Additionally, Officer Hanson was concerned about Fonseca's safety due to his statement and the officers' safety while searching the vehicle on the interstate. Fonseca did not object to the officers moving the vehicle or with riding with Officer Hanson to the impound lot, suggesting Fonseca further consented to a continued detention and search. See *United States v. Lopez-Vargas*, 457 F.3d 828, 831 (8th Cir. 2006) (holding an objectively reasonable officer could believe an individual's consent to search a vehicle extended to moving the vehicle to a different location such as police headquarters).

Assuming Fonseca did not consent to further detention, Officer Hanson required reasonable suspicion that criminal activity may be afoot to continue Fonseca's detention. An investigative detention must be supported by a reasonable articulable suspicion of criminal activity. See *United States v. Green*, 691 F.3d 960, 963 (8th Cir. 2012).

> [The Eighth Circuit] has summarized the standards used to consider whether reasonable suspicion exists as follows:
> 
> The standard of articulable justification required by the fourth amendment for an investigative, Terry-type seizure is whether the police officers were aware of particularized, objective facts which, taken together with rational inferences from those facts, reasonably warranted suspicion that a crime was being committed. In assessing whether the requisite degree of suspicion exists, we must determine whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion. The totality of the circumstances -- the whole picture -- must be taken into account. We may consider any added meaning certain conduct might suggest to experienced officers trained in the arts of observation and crime detection and acquainted with operating modes of

---

[1] Fonseca cited to *$141,770.00*, 157 F.3d at 603-04 wherein the court recognized "any amount of money, standing alone, would probably be insufficient to establish probable cause"; however, the court also *cited United States v. Thirty-Nine Thousand Eight Hundred Seventy-Three & No/100 Dollars ($39,873.00)*, 80 F.3d 317, 319 (8th Cir. 1996) wherein the court "recognized that possession of a large amount of cash (here, nearly $40,000) is strong evidence that the cash is connected with drug trafficking." Regardless, in this case the court is not faced with just "any amount of money, standing alone" but a large amount of money with other circumstantial evidence.

>criminals. It is not necessary that the behavior on which reasonable suspicion is grounded be susceptible only to an interpretation of guilt, however, the officers must be acting on facts directly relating to the suspect or the suspect's conduct and not just on a "hunch" or on circumstances which describe a very broad category of predominantly innocent [people].

*United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998) (internal citations and quotations omitted). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Walker*, 555 F.3d 716, 719 (8th Cir. 2009). Removing a defendant during an investigative detention to another location does not violate the Fourth Amendment. **See** *United States v. Correa*, 641 F.3d 961, 967 (8th Cir. 2011). Further, officers may move a vehicle in order to conduct a more thorough search in a safer location. **See** *United States v. Saenz,* 474 F.3d 1132, 1137 (8th Cir. 2007). Based on the totality of the circumstances noted above, Officer Hanson had reasonable suspicion to detain Fonseca and search the vehicle. Fonseca's detention was not too long in duration and Officer Hanson diligently pursued a means of investigation that confirmed or dispelled his suspicions.

Because the court finds no illegality in Officer Hanson's contact with Fonseca or the consensual searches, statements Fonseca made during or after the officers searched Fonseca's vehicle at the impound are not tainted by any previous illegality. Accordingly,

**IT IS RECOMMENDED TO CHIEF JUDGE LAURIE SMITH CAMP that**:
Jose Luis Fonseca Ramirez's motion to suppress ([Filing No. 73](Filing No. 73)) be denied.

### ADMONITION

Pursuant to [NECrimR 59.2](NECrimR 59.2) any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within fourteen (14) days after being served with a copy of this Findings and Recommendation. Failure to timely object may constitute a waiver of any such objection. The brief in support of any objection shall be filed at the

time of filing such objection. Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 2nd day of August, 2013.

BY THE COURT:

 s/ Thomas D. Thalken
United States Magistrate Judge